# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3717

_____

Antonina Averianova,

        Petitioner,

v.

Michael B. Mukasey, Attorney General
of the United States of America,

        Respondent.

 

_____

No. 06-3718

_____

Oksana Averianova,

        Petitioner,

v.

Michael B. Mukasey, Attorney General
of the United States of America,

        Respondent.

Petition for Review of an Order of
the Board of Immigration Appeals.

_____

Submitted: September 27, 2007
Filed: December 10, 2007 **(Corrected 12/10/07)**

_____

Before COLLOTON, ARNOLD and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Antonina and Oksana Averianova, citizens of Uzbekistan, petition for review of a Board of Immigration Appeals ("BIA") decision affirming the immigration judge's ("IJ") denial of the Averianovas' applications for asylum and for withholding of removal.[1]  For the reasons discussed below, we deny the Averianovas' petitions.

## I.    BACKGROUND

Antonina and Oksana Averianova are a mother and daughter seeking asylum in the United States because of alleged persecution on account of their Jewish ethnicity and religious beliefs.

Antonina was born in Russia in 1951.  Her family moved to Uzbekistan shortly after her birth.  She has two children, Oleg and Oksana.  Antonina claims that her father was Jewish and her mother Russian, but her mother "adopted" her father's ethnicity upon marriage.  Antonina does not practice Judaism regularly and only began practicing in the late 1980s.  She cites various incidents of past persecution in Uzbekistan, allegedly because of her Jewish background.  She testified that she was once attacked on a bus because she was not Muslim.  On another occasion a man yelling about Jews hit her and split her lip.  Her son was beaten for not being Muslim and having Jewish roots.  She did not report any of these incidents to the police.  In 1992, Antonina arrived as a non-immigrant visitor to the United States.  She applied for asylum in 1993.

_____

[1]The IJ and BIA also rejected the Averianovas' claim for protection under the Convention Against Torture ("CAT").  The Averianovas have not set forth an argument on appeal regarding the CAT ruling.  Therefore, petitioners waive this claim. *See Chay-Velasquez v. Ashcroft*, 367 F.3d 751, 756 (8th Cir. 2004).

Oksana testified to various problems she encountered in Uzbekistan because of her alleged Jewish ethnicity. In school, she faced frequent taunting. A group of girls once threatened her and pushed her head in a toilet. She recalled incidents of Muslim men harassing her, slapping her in the face, calling her a Jewish whore, and threatening to cut her legs for wearing a short skirt. She reported that her professors at night college prevented her from participating in class and that she had difficulty finding employment in Tashkent, the capital of Uzbekistan. Oksana did not report any of these incidents to the police. She arrived in the United States in 1996 and applied for asylum shortly thereafter. She does not practice Judaism in the United States. The IJ consolidated her case with Antonina's.

During the asylum proceedings, the Averianovas submitted several birth certificates to prove their Jewish ethnicity. (In the former Soviet Union, the government considered "Jewish" an ethnicity and listed it on birth certificates as a nationality.) None were original documents, and the Averianovas testified that any original documents, such as original birth certificates, internal passports, travel passports or marriage certificates, had been lost or stolen. The Immigration and Naturalization Service ("INS"),[2] in conjunction with the American embassy in Tashkent, investigated the birth certificates submitted by the Averianovas and identified specific discrepancies that called into question their authenticity.

The Averianovas presented a translated copy of Oksana's birth certificate, notarized in Russia in 1994, which stated that Antonina was "Jewish." In May 2002, the INS gave the copy of Oksana's birth certificate to American embassy personnel in Tashkent. Embassy staff then asked the local register of Tashkent to access Oksana's birth record. The embassy personnel discovered that the official record of Oksana's birth listed Antonina's nationality as "Russian." Oksana contended that the

---

[2]The INS ceased to exist March 1, 2003, and its functions were transferred to the new Department of Homeland Security ("DHS"). *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002). We shall continue to refer to the DHS as the INS in this opinion.

embassy report was an unreliable, hand-written copy, and that it erroneously listed her birth date. American embassy officials subsequently obtained two digital photographs of her birth record. The photographs showed Antonina's nationality as "Russian." The register also corrected the birth date error after embassy staff identified it. The IJ found that the two documents were "identical . . . with one exception"—the nationality of "Russian" in the original record had been changed to "Jewish" in Oksana's copy.

After the INS's original inquiry into Oksana's birth certificate, the Averianovas initiated a court proceeding in Tashkent on March 5, 2003, to amend Antonina's father's birth record to state that he was Jewish. Antonina's father's original birth certificate indicated that he was Russian. The court changed the record on May 21, 2003. The Averianovas submitted the amended birth certificate and the record of the Tashkent court hearing to the IJ.

Once the INS discovered that Oksana's birth record actually stated that Antonina was "Russian," not "Jewish," the Averianovas submitted several more copies of birth certificates to the IJ. First, a copy of Antonina's brother Victor's birth certificate dated August 10, 2002 reflected that his (and Antonina's) father was "Jewish." The INS obtained digital photographs of the original birth record bearing the serial number reflected on the copy submitted by the Averianovas and determined that the serial number reflected on the copy actually was contained on a birth certificate issued to someone other than Victor. Second, a birth certificate submitted for Oleg stated that his mother Antonina was "Jewish." The INS obtained two digital photographs of his actual birth record in Tashkent that listed Antonina's nationality as "Russian." Third, Antonina submitted a copy of her birth certificate issued in 1992 that listed her father's nationality as "Jewish." The INS found that the serial number on this birth certificate also was issued to someone else and obtained a copy of that person's birth record.

The IJ rejected the Averianovas' asylum claims. The IJ focused on their claims of persecution based upon their Jewish ethnicity because that was the "overwhelming

-4-

thrust" of their claims, and they had not provided sufficient testimony regarding claims of persecution on account of their non-Uzbek ethnicity. The IJ determined that the photographs of Uzbek records were trustworthy and persuasive evidence. The IJ found that the Averianovas had submitted fraudulent documents, which adversely affected their credibility. He also found that they offered no explanation for the discrepancies. He held that without credible proof of their Jewish ethnicity, their asylum claims failed. The IJ refused to extend comity to the Tashkent court proceeding of March 5, 2003. He also found a "lack of any objective corroborating evidence" regarding the Averianovas' alleged persecution. On account of the lack of credible testimony and lack of corroborating evidence, the IJ also rejected their claims for withholding of removal.

In attempting to verify the birth certificates the Averianovas submitted, the INS sent them to the American embassy in Tashkent. Embassy staff checked records and made inquiries to local Uzbek officials. The Averianovas contended that confidential information had been revealed in the course of the investigation in violation of 8 C.F.R. § 208.6, which generally prohibits disclosing information submitted in an asylum application unless the applicant gives written consent. The Averianovas argued that the disclosures gave rise to an inference that they had applied for asylum, which they claimed created a separate basis for asylum. The IJ found no proof that the INS had revealed confidential information to Uzbek authorities. He determined that the INS merely investigated a vital statistic, their ethnicity, which could relate to any number of ordinary government investigations. Additionally, because the Averianovas went to an Uzbek tribunal to alter family birth records regarding their Jewish ethnicity, the IJ doubted that the Averianovas had any real concern over a release of that information to the Uzbek government. Therefore, the IJ refused to grant relief on this basis as well and denied their applications.

The BIA adopted and affirmed the IJ's determination. It first agreed that the Averianovas had offered "only conjecture" to explain why the false documents differed from the official Uzbek records. It also determined that it would not grant

comity to the decision of a foreign tribunal "where fraud and manipulation of the immigration laws were present." Additionally, the BIA held that this adverse credibility determination tainted the overall credibility of the Averianovas, which affected both the Jewish claims and the non-Uzbek claims. The BIA also agreed that the INS did not breach the Averianovas' confidentiality.

## II. DISCUSSION

"When the BIA adopts the IJ's decision, but adds reasoning of its own, we review both decisions." *Setiadi v. Gonzales*, 437 F.3d 710, 713 (8th Cir. 2006). We affirm the decisions if they are supported by substantial evidence in the record. *Singh v. Gonzales*, 495 F.3d 553, 556 (8th Cir. 2007). We review questions of law de novo, and we will reverse findings of fact only if the evidence is "so compelling that no reasonable fact finder could fail to find in favor of the petitioner." *Turay v. Ashcroft*, 405 F.3d 663, 666–67 (8th Cir. 2005).

### A. Asylum

"The Attorney General has discretion to grant asylum to a refugee, defined as an alien who is unable or unwilling to return to her home country because of past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Onsongo v. Gonzales*, 457 F.3d 849, 852 (8th Cir. 2006); *see* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1); 8 C.F.R. § 208.13. The applicant must establish that one of the five protected grounds "was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(I). An applicant can establish a well-founded fear of future persecution by showing that she has a subjective fear of persecution and that "credible, direct, and specific evidence" establishes that a reasonable person in the applicant's situation would fear persecution. *Mamana v. Gonzales*, 436 F.3d 966, 968 (8th Cir. 2006).

## 1. Adverse Credibility Finding

An applicant bears the burden of satisfying the IJ that her "testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. §1158(b)(1)(B)(ii). "A credibility determination is a finding of fact, and § 1252(b)(4)(B) provides that it should be accepted 'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Singh*, 495 F.3d at 556 (quoting 8 U.S.C. § 1252(b)(4)(B)). The combination of an adverse credibility finding and a lack of corroborating evidence for the claim of persecution means that the applicant's claim fails, "regardless of the reason for the alleged persecution." *Sivakaran v. Ashcroft*, 368 F.3d 1028, 1029 (8th Cir. 2004). In this case, we find that the record does not compel a conclusion contrary to that reached by the IJ and BIA because the Averianovas submitted fraudulent documents, could not explain the numerous discrepancies, and failed to provide evidence otherwise corroborating their claim of persecution on the basis of their Jewish ethnicity.

The IJ found that the Averianovas lacked credibility because they submitted fraudulent documents. The INS's investigation provided strong evidence that the Averianovas' actual birth records consistently contradicted the nationality listed in the birth certificates that they submitted. The Averianovas supplied additional false birth certificates after the birth certificate presented by Oksana had been proven false by photographic evidence. The birth certificates purporting to be Oksana's and Oleg's indicated Antonina's nationality as "Jewish," but the INS presented photographs showing that the actual birth certificates stated Antonina's nationality as "Russian." Antonina's "Jewish" birth certificate was generated in 1992, around the time the Averianovas intended to enter the United States. The birth certificates purporting to be Antonina's and her brother's contained serial numbers of birth certificates issued to other individuals, not the Averianovas. "While minor inconsistencies and omissions will not support an adverse credibility determination, inconsistencies or omissions that relate to the basis of persecution are not minor but are at the heart of

the asylum claim." *Kondakova v. Ashcroft*, 383 F.3d 792, 796 (8th Cir. 2004) (internal quotation omitted).

The Averianovas on appeal claim that they had no knowledge that the documents were fraudulent, and, therefore, they should not be subject to an adverse credibility determination. They rely on *Kourski v. Ashcroft*, 355 F.3d 1038 (7th Cir. 2004), which requires the IJ to find that the applicant knew or had reason to know about the fraudulent nature of submitted documents. *Id.* at 1039–40. In *Kourski*, the applicant claimed that he received the documents from his mother and that the forgery was subtle, which undermined the notion that the applicant knew or had reason to know about the fraud. *Id.* We have held that "[a]n IJ may base an adverse credibility determination upon submission of fraudulent documents if the petitioner fails to offer a legitimate explanation for the suspected fraud." *Onsongo*, 457 F.3d at 854. In *Ignatova v. Gonzales*, 430 F.3d 1209 (8th Cir. 2005), for example, we reviewed an IJ's determination that the applicant submitted a frivolous asylum claim, in part because she submitted a fraudulent document. We distinguished *Kourski* because "the IJ explicitly found that the document submitted by Ignatova was fraudulent," and the applicant "never provided any explanation about the discrepancy." *Id.* at 1214. In this case, the IJ explicitly made both findings, and he did so regarding not just one, but four documents.

The Averianovas attempt to explain the discrepancies between the submitted documents and the official records by attacking the INS's investigation. They argue that the IJ should not have trusted the INS's investigation because Uzbek officials may have altered or provided incorrect documents and because the Averianovas' expert witnesses identified possible record-keeping errors systemic to the former Soviet Union. The IJ weighed this evidence and determined that the INS's investigation was trustworthy, particularly because of photographic proof submitted by the INS. Therefore, the IJ found that these circumstances resulted in an adverse credibility finding. We are not convinced that a reasonable adjudicator would be compelled to find the contrary.

In light of the adverse credibility finding, the Averianovas attempted to present evidence corroborating their Jewish ethnicity and of their past persecution or well-founded fear of future persecution on account of it. The only corroborating evidence the Averianovas offer in regard to their Jewish ethnicity was the Tashkent tribunal decision amending their father's ethnicity from "Russian" to "Jewish" on a birth certificate issued in Chelyabinsk, Russia, which they urge deserves comity.[3] It is questionable whether comity should be extended to an ex parte, quasi-administrative proceeding initiated ten years after filing the original asylum claim in the United States. The proceeding began only after the Averianovas received word from the INS that their original documentation was false, calling into question their claims regarding their ethnicity. The BIA pointed out that retroactive foreign judgments regarding marital status are not granted comity where "fraud, misrepresentation, or manipulation of the immigration law" are present. *Matter of Magana*, 17 I. & N. Dec. 111, 113 (B.I.A. 1979). The BIA concluded that, similarly, comity would not be extended to the decision of the Uzbek court in a proceeding regarding birth certificate information initiated after asylum proceedings began because of the presence of "fraud and manipulation." Under the circumstances of this case, where an applicant initiates a foreign court proceeding after an asylum case has begun and in light of the evidence of fraud and manipulation, we agree and refuse to find that the Tashkent court's actions constitute sufficient corroborating evidence such that a reasonable adjudicator would be compelled to find the Averianovas' testimony credible.

Even assuming arguendo that the Tashkent court order provides sufficient corroborating evidence that the Averianovas are Jewish, the Averianovas still do not offer sufficient corroborating evidence that they suffered past persecution or that they

---

[3]Comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895).

have a well-founded fear of future persecution. They reported no incidents of abuse to the police. Their only corroborating evidence comes in the form of expert witness testimony regarding conditions in Uzbekistan. Those experts could not testify to the Averianovas' past persecution. The experts could only attest to the country conditions regarding the reasonableness of their well-founded fear of future persecution. On the other hand, the IJ cited the INS's country condition reports regarding civil liberties and human rights in Uzbekistan, which indicated that Jews enjoy religious freedom and that no pattern of discrimination against Jews exists. These country condition reports constitute substantial evidence supporting the IJ's and BIA's decisions. *See Kondakova*, 383 F.3d at 796–97 (finding that reliance upon country condition reports constitutes substantial evidence to support a determination that petitioner failed to provide corroborating evidence to overcome an adverse credibility finding).[4]

### 2. Confidentiality

The Averianovas also claim that the INS breached their confidentiality in its investigation of the authenticity of the birth certificates they submitted and that this breach provides them a new and independent basis for an asylum claim. Courts

---

[4]The Averianovas insist that the IJ failed to consider their non-Jewish claims, such as fear of returning to Uzbekistan because they are non-Uzbeks or fear of returning because they have lived in the United States for several years. Because of the adverse credibility finding, the Averianovas must have offered sufficient corroborating evidence regarding persecution against them on non-Jewish grounds, which they failed to do. They presented one statement from one expert's testimony that marginally supported their claim. This scant evidence cannot make up for the lack of credible testimony. *See Sivakaran*, 368 F.3d at 1029 (holding that an asylum claim fails when there is an adverse credibility finding and a lack of corroborating evidence). Additionally, they did not testify that they feared persecution from Uzbek officials, and they failed to offer evidence that they would be persecuted by individuals the government is unable or unwilling to control. *Nabuwala v. Gonzales*, 481 F.3d 1115, 1118 (8th Cir. 2007).

"generally accord Government records and official conduct a presumption of legitimacy." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 179 (1991); *accord Lin v. U.S. Dep't of Justice*, 459 F.3d 255, 265 (2d Cir. 2006) (adopting language of *Ray* in breach of confidentiality analysis). We give substantial deference to the BIA's interpretation of its statutes and regulations. *Varela v. Ashcroft*, 368 F.3d 864, 866 (8th Cir. 2004); *Lin*, 459 F.3d at 262. We look to the INS's interpretation of its own regulation, but only "if the meaning of the words used is in doubt." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *see Hailemichael v. Gonzales*, 454 F.3d 878, 883 (8th Cir. 2006) (citing *Seminole Rock*).

Section 208.6 requires that "[i]nformation contained in or pertaining to any asylum application . . . shall not be disclosed without the written consent of the applicant." 8 C.F.R. § 208.6(a).[5] The regulation provides for certain exceptions to the general prohibition, and the INS argues that, pursuant to an exception, it may reveal information to government officials who need to examine an asylum application. *See id.* § 208.6(c)(1). The Averianovas, however, do not contest the INS revealing information to American embassy personnel in Tashkent. Instead, they claim that revealing information to Uzbek officials violated their confidentiality. Therefore, that exception to the regulation does not apply.

The Averianovas' breach of confidentiality claim fails because the record reveals no evidence that the INS "disclosed" any "information contained in or pertaining to any asylum application" to Uzbek officials when examining the Averianovas' official birth records. The INS gave the birth certificate copies submitted by the Averianovas to American embassy staff to determine their authenticity. The record does not reveal, nor do the Averianovas argue, that the INS

---

[5]The Averianovas each orally consented to an investigation on the record and in the presence of counsel, but they did not provide "written consent." *See* 8 C.F.R. § 208.6(a). Although an investigation undoubtedly requires a minimal amount of disclosure, such as revealing an applicant's name and date of birth, we do not reach the issue of whether the Averianovas's oral consent to the investigation was sufficient.

or American embassy personnel presented those documents to Uzbek officials. At best, the record reflects that the INS and embassy staff had possession of the birth certificates and that the INS and embassy staff obtained copies of Uzbek birth records by requesting Uzbek officials for access to them.

In the Second Circuit's *Lin* decision, the INS provided the applicant's criminal "Certificate of Release," a document commonly related to asylum claims, to the Chinese government. *Lin*, 459 F.3d at 265. In this case, however, the record does not reflect that the INS *gave* such a document to Uzbek officials. The INS *requested* copies of birth records, which is not a disclosure of information contained in an asylum application. Embassy staff asked what forms Uzbek officials used when producing birth certificates, obtained digital photographs of the Averianovas' birth records, and asked local police contacts about specific information found in Uzbek birth records. These inquiries did not disclose any information contained in or pertaining to an asylum application to Uzbek officials. The record only reflects inquiries regarding information contained in Uzbek records. We find that the Averianovas have not overcome the presumption of regularity in the INS's investigation. The IJ did not err in finding that these inquiries did not constitute a disclosure prohibited by the regulation.

The Averianovas also claim that the INS revealed their names and Oksana's date of birth to Uzbek officials. Additionally, the Averianovas assert that making specific inquiries of Uzbek officials regarding their ethnicity rose to the level of a disclosure of information pertaining to their asylum applications. Even if we assumed that these inquiries constituted disclosures under the regulation, that alone does not necessarily entitle them to asylum relief.

Because the regulation itself provides no remedy at all, we look to the INS's interpretation of its own regulation, which is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation omitted); *see Lin*, 459 F.3d at 262. The INS has interpreted § 208.6 in a memorandum known as the "Cooper Memo" and in a guide to confidentiality known

as the "Fact Sheet."[6]  The Cooper Memo describes three types of disclosures that could result in a breach of confidentiality.

> Generally, confidentiality of an asylum application is breached when information contained therein or pertaining thereto is disclosed to a third party, and the disclosure is of a nature that allows the third party to link the identity of the applicant to: (1) the fact that the applicant has applied for asylum; (2) specific facts or allegations pertaining to the individual asylum claim contained in an asylum application; or (3) facts or allegations that are sufficient to give rise to a reasonable inference that the applicant has applied for asylum.

Cooper Memo at 3–4; *see Lin*, 459 F.3d at 263.

The INS has also suggested that if a disclosure gives rise to a reasonable inference that an applicant has applied for asylum, an applicant may have a new and independent basis for an asylum claim.  The Fact Sheet states, "[P]ublic disclosure might, albeit in rare circumstances, give rise to a plausible protection claim where one would not otherwise exist by bringing an otherwise ineligible claimant to the attention of the government authority or non-state actor against which the claimant has made allegations of mistreatment."  Fact Sheet at 2; *see Lin*, 459 F.3d at 263.

Pursuant to the INS's interpretation of § 208.6, a disclosure that does not give rise to a reasonable inference that the applicant has applied for asylum "does not necessarily require the vacatur of an order of removal." *Lin*, 459 F.3d at 267.  Instead,

---

[6]The Averianovas rely upon the Cooper Memo and the Fact Sheet in their brief and do not contest the INS's interpretation of its regulation.  *See* Memorandum from Bo Cooper, INS General Counsel, to Jeffrey Weiss, INS Director of Int'l Affairs, *Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information* (June 21, 2001) ("Cooper Memo"), *available at* http://judiciary.house.gov/legacy/82238.pdf at 39–45; U.S. Citizenship and Immigration Services, *Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applicants* (June 3, 2005) ("Fact Sheet"), *available at* http://www.uscis.gov/files/pressrelease/FctSheetConf061505.pdf.

an applicant may establish a new and independent basis for asylum by showing that the disclosure gives rise to a reasonable inference that the applicant has applied for asylum.[7] *See Lin*, 459 F.3d at 266–68 (finding the INS interpretation not plainly erroneous and reaching a similar conclusion); *see also Abdel-Rahman v. Gonzales*, 493 F.3d 444, 454 (4th Cir. 2007) (accepting the *Lin* court's reasoning and adopting the INS interpretation).

The Cooper Memo distinguishes between inquiries that breach confidentiality and inquiries that do not. For instance, submitting a document known to form the basis of an asylum claim could give rise to a reasonable inference that a person has made an asylum claim. Cooper Memo at 4; *see Lin*, 459 F.3d at 265 (finding a "Certificate of Release," commonly related to asylum claims of former Chinese prisoners, sufficient to give rise to a reasonable inference that the petitioner had an asylum claim). In contrast, the INS does not breach confidentiality if the "inquiry is routinely conducted for reasons unrelated to an asylum application, such as for an employment application or a visa application." Cooper Memo at 5.

At most, the INS provided the Averianovas' names and Oksana's date of birth to Uzbek officials when requesting copies of their birth records. We find that even if these are disclosures, they do not give rise to a reasonable inference that the Averianovas had applied for asylum. Additionally, inquiring into their ethnicity, a vital statistic commonly found in birth records, also does not give rise to such an inference. Indeed, the Second Circuit concluded, "Many documents, such as birth certificates, marriage licenses, or even some court records, do not necessarily imply that a foreign national is seeking asylum." *Lin*, 459 F.3d at 270. The Averianovas have noted that "Jewish" refers to nationality in Uzbekistan and appears in Uzbek birth records. The IJ correctly found that the investigation of the contents of a birth certificate, including nationality or ethnicity, could relate to an adjustment application,

_____

[7]We assume without deciding that a person seeking asylum qualifies as a person who is a member of a "particular social group" pursuant to 8 U.S.C. § 1101(a)(42)(A).

-14-

a marriage investigation, visa petitions, or other benefits applications. Therefore, we agree with the BIA's conclusion that these inquiries did not give rise to a reasonable inference that they applied for asylum.

Moreover, even if the INS made disclosures that were covered by the regulation that were sufficient to give rise to a reasonable basis for a new and independent claim for asylum, we would still deny their petition. The BIA also found that the Averianovas did not present sufficient evidence that they would be subject to persecution as asylum applicants. The Averianovas did not testify that they feared persecution from Uzbek officials as asylum applicants, and they failed to offer any other evidence that they, as asylum applicants, would be persecuted by individuals the government is unable or unwilling to control. *See Nabuwala v. Gonzales*, 481 F.3d 1115, 1118 (8th Cir. 2007) ("Persecution may be a harm to be inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control.") (internal quotation omitted). Thus, the BIA's finding that the Averianovas had not established a well-founded fear of future persecution based on having applied for asylum is supported by substantial evidence.

The BIA did not err in concluding that the Averianovas are not entitled to asylum based on their claim that the INS breached their confidentiality.

## B. Withholding of Removal

To establish a claim for withholding of removal under 8 U.S.C. § 1231(b)(3), an applicant must demonstrate a clear probability of persecution, which is a more difficult standard to meet than demonstrating a well-founded fear of future persecution. *Samedov v. Gonzales*, 422 F.3d 704, 708 (8th Cir. 2005). Because the Averianovas have not met the burden of proof for their asylum claims, they also fail to meet the higher burden of proof required for obtaining withholding of removal. *See Ibrahim v. Gonzales*, 434 F.3d 1074, 1079 (8th Cir. 2006).

## III.  CONCLUSION

For the foregoing reasons, we deny the Averianovas' petitions for review.

_____