[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 4, 2012
JOHN LEY
CLERK

_____

No. 11-10559

_____

Agency No. A088-258-914


OLHA LYASHCHYNSKA,

                                                    Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                    Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(April 4, 2012)

Before DUBINA, Chief Judge, FAY, and KLEINFELD,* Circuit Judges.

FAY, Circuit Judge:

_____

*Honorable Andrew J. Kleinfeld, United States Circuit Judge, Ninth Circuit, sitting by designation.

Olha Lyashchynska ("Petitioner") seeks review of a final order of removal issued by the Board of Immigration Appeals ("BIA") dismissing her appeal of an Immigration Judge's ("IJ") ruling denying her application for asylum and withholding of removal and protection under the Convention Against Torture and other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"),[1] based on a finding of adverse credibility. On appeal, Petitioner alleges two bases for reversal: (1) the BIA erred in finding that the IJ considered the totality of the circumstances regarding the authenticity of the proffered evidence; and (2) the BIA erred in finding that the State Department Investigator ("Investigator") did not violate the confidentiality requirement during the investigation of Petitioner's case. After review, we affirm.

I.[2]

Petitioner, a citizen of the Ukraine, was admitted to the United States on or about May 23, 2006, as a J-1 exchange visitor. She changed her status to student on December 11, 2006. On March 28, 2007, Petitioner applied for asylum, claiming that she had been mistreated in Ukraine due to her sexual orientation. After being interviewed by an asylum officer, she was denied asylum and her case

_____

[1] See 8 C.F.R. §§ 208.16(c), 1208.17 (2008).

[2] The following facts are drawn from Petitioner's testimony at her hearings before the IJ on February 19, 2009; May 21, 2009; and June 30, 2009.

was referred to an IJ. Based on the denial and referral to an IJ, Petitioner was issued a Notice to Appear, pursuant to section 237(a)(1)(C)(I) of the Immigration Nationality Act, 8 U.S.C. § 1227(a)(1)(C)(I). As an alien admitted as a non-immigrant who failed to comply with the conditions of such status, she was charged with removeability.

In the ensuing proceedings before the IJ, Petitioner renewed her application for asylum, withholding of removal, and protection pursuant to the CAT. During the hearing on February 2009, she testified that in March 2004, she was raped by a man she had been dating for some months ("Boyko") who is the son of a Ukrainian government official, and two of his friends. Boyko invited her to his apartment under the ruse that they would be joining several of his friends. Once there, Petitioner testified that Boyko and his friends forced her to drink an entire bottle of vodka, beat her with towels, tore her clothes, slapped and ultimately raped her. Petitioner testified that they told her that they were teaching her "how to be a real woman." After the incident, Petitioner's mother took her to the hospital in Ternopil where she remained over night with severe headaches resulting from a concussion. Petitioner stated that she subsequently filed a complaint with the police, but that the police closed the investigation due to a purported lack of evidence.

Petitioner also testified that she belonged to a social club off campus where members were of "untraditional orientation." The social club was open to "gays." Petitioner testified that, in November 2004, six people came into the club and began calling everyone "filthy gays and lesbians." Petitioner said that she was kicked, had her hair pulled, and suffered bruises to her legs. Her girlfriend at the time, Yulia, was also at the club and she lost a tooth during the incident. Petitioner identified the attackers as skinheads because of their clothing, but they escaped arrest by fleeing when they heard the police sirens.

Petitioner also testified that, in another incident in December 2005, she was on her way home for the holidays and was attacked at a railway station. She stated that a group of men "rushed" her, beat her, and urinated on her. Due to her injuries, she required and received medical attention at the railway station, and at the local hospital's emergency room. Petitioner testified that she again attempted to file a police report but, after the officers learned of her sexual orientation, they would not accept her complaint. After that, Petitioner stated that her parents received threatening letters from skinheads and that windows at her house were smashed. Petitioner then decided to come to the United States.[3]

---

[3] Four months after her arrival in the United States, Petitioner married a man, despite her sexual orientation, because the guy "was like really nice" to her. That relationship lasted two months. She never obtained a divorce, however, because she did not have the money and her

On cross-examination, Petitioner was asked how she obtained the documents she submitted to the Department of Homeland Security ("DHS") in support of her asylum application. Petitioner responded that her father had to "pay somebody" to get a copy of the police report. As to the medical records, Petitioner stated that her parents sent those to her from the Ukraine because her mom kept all of her medical records. At that point in the proceedings, the DHS attorney confronted Petitioner with evidence from the record, indicating that Petitioner's supporting documents were not authentic.

The evidence submitted by the DHS resulted from an investigation by the Fraud Detection National Security Section ("Fraud Detection Section") and the Department of State to verify the veracity of the various items of supporting evidence submitted in Petitioner's asylum application. On October 31, 2007, the Department of State issued a report ("Report") of its investigation. As to Petitioner's alleged rape, the Report revealed that the United States Embassy in Ukraine contacted the Ternopil city hospital by telephone and that the hospital was unable to confirm that Petitioner had been treated by the hospital. In the Report, the head of the medical commission stated that Petitioner's document was not issued by the hospital because, if it had been, it would have contained the

husband's father was in the hospital.

5

signature of at least three doctors. The copy she provided had only one signature. Furthermore, the name of the one doctor who was listed was not legible, so the investigator was unable to verify whether the signing doctor in fact worked at the hospital. The Report further found that the police report relating to the 2004 rape incident was not authentic because the person signing that notice left the department in 2003 and therefore could not have signed a document issued in January 2004. In regard to the medical report concerning the 2005 railway incident, the Report indicated that, in a letter faxed to the embassy, the head physician of the Ternopil city hospital stated that it had no record of issuing medical certificates to Petitioner, or that she had ever been a patient at the hospital.

Expressing his concern about the evidence presented in light of the DHS's Report, the IJ continued the hearing to allow Petitioner the opportunity to present rebuttal evidence. The IJ noted that he would not tell Petitioner "what to do or what not to do" but informed her that there were steps her counsel could take to resolve the inconsistencies in the evidence.[4] As a final matter at that hearing, the

---

[4] The IJ noted that Petitioner's counsel could obtain a waiver from his client concerning her medical records and send letters directly to the institutions in the Ukraine asking them to send documents directly back to the attorney verifying her claim, or that counsel could obtain local counsel in the Ukraine to assist in the matter.

IJ accepted the testimony of Petitioner's current girlfriend in the Untied States, as set forth in a statement she provided to the court, stating she had been in a relationship with Petitioner since April 2008.

On May 4, 2009, Petitioner filed a motion for continuance, which was denied for failure to demonstrate diligence. The hearing commenced again on May 12, 2009, at which time Petitioner's counsel indicated that he had a polygraph and two statements to submit for consideration. The IJ expressed hesitation in accepting those documents because they had not been provided to the government for verification. The IJ again adjourned the hearing because Petitioner had not yet received a response that she was expecting from the Ternopil city hospital.

On June 30, 2009, Petitioner appeared before the IJ for a third time but was again unable to produce any corroborating evidence. Petitioner's counsel argued that Ukrainian hospitals were state-run and not private entities and therefore were not cooperative in providing documents to Petitioner's counsel. Counsel submitted a letter from Petitioner's father, stating that when he went to internal affairs to get information about his daughter's rape, the police threatened to arrest and imprison him, and accused him of insulting the head of the department. Petitioner's counsel also submitted purported originals of the medical reports that

had been previously submitted with her asylum application. The IJ noted that those were the same documents that the hospital had reviewed and found fraudulent in the Report. At that time, Petitioner's counsel argued that the confidentiality provisions regarding asylum applicants had been violated by the Investigator in procuring the information listed in the Report.

At the culmination of the third hearing on June 30, 2009, the IJ issued an oral decision denying Petitioner's application and ordering her removal to the Ukraine. The IJ noted that Petitioner had not provided credible evidence to corroborate the alleged medical treatment she received for her attacks, or the police documents provided to the asylum officer. The IJ concluded that Petitioner had been given ample time to clarify those inconsistencies and failed to do so or to provide any credible explanation that would account for the inconsistencies.

On January 11, 2011, Petitioner appealed the IJ's findings to the BIA, which the BIA dismissed. The BIA, like the IJ, held that based on the record evidence, Petitioner did not demonstrate that the IJ's adverse credibility determination was clearly erroneous. Moreover, the BIA noted that Petitioner did not cite to any information in the country conditions evidence that showed the medical institutions of the Ukraine are in collusion with security forces to hide treatment of injuries afflicted by third parties. The BIA also rejected Petitioner's argument that

8

the Investigator violated the confidentiality requirements during the investigation of her medical and police reports by disclosing her name to Ukrainian officials. Accordingly, the BIA affirmed the IJ's decision and dismissed Petitioner's appeal. This appeal followed.

## II.

"When the BIA issues a decision, we review the BIA's decision, except to the extent that the BIA has expressly adopted the IJ's decision." Ruiz v. Gonzales, 479 F.3d 762, 765 (11th Cir. 2007) (citing Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001)). "In that instance, we review the IJ's decision as well." Id. (citation omitted). If the BIA's decision is supported by reasonable, substantial, and probative evidence when the record is considered as a whole, this Court must affirm. Id. (citing Ashcroft, 257 F.3d at 1284). "To conclude the BIA's decision should be reversed, 'we must find that the record not only supports the conclusion, but compels it.'" Id. (citing Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002)). "Factual determinations, including credibility determinations, are reviewed under a substantial evidence standard, which provides that the decision can be reversed only if evidence compels a reasonable fact finder to find otherwise." Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1276 (11th Cir. 2009) (internal quotations omitted) (citing Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226,

1230 (11th Cir. 2005)).  We must affirm the agency's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."  D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004) (citations and quotations omitted).

III.

There are two issues on appeal: (1) whether the IJ and the BIA weighed the evidence of document authenticity in light of the totality of the circumstances when making their respective credibility determinations; and (2) whether the Investigator conducting the investigation of Petitioner's alleged abuse in the Ukraine failed to comply with the confidentiality requirement of 8 C.F.R. §1208.6, which generally prohibits disclosing information submitted in an asylum application unless the applicant gives written consent. We address each issue in turn.

A.

"An applicant bears the burden of satisfying the IJ that her testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee."  Averianova v. Mukasey, 509 F.3d 890, 897 (8th Cir. 2007) (quotations omitted) (citing 8 U.S.C. § 1158(b)(1)(B)(ii)).  An adverse credibility determination coupled with a lack of corroborating evidence for a claim of persecution means that the applicant's claim fails.  Id. at 895.  "Where there are

10

two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985) (citation omitted). "If an alien's testimony is credible, it may be sufficient, without corroboration, to satisfy his burden of proof in establishing his eligibility for relief from removal." Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1231 (11th Cir. 2006) (citing Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005)); see also 8 C.F.R. §§ 208.13(a), 208.16(b). A denial of relief, however, can be supported solely by an adverse credibility determination, especially if the alien fails to produce corroborating evidence. See Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1347 (11th Cir. 2008) ("Th[e] language in [8 C.F.R. § 208.13] plainly indicates that if the trier of fact either does not believe the applicant or does not know what to believe, the applicant's failure to corroborate his testimony can be fatal to his asylum application.") (alternation in original) (citing Sidhu v. INS, 220 F.3d 1085, 1090 (9th Cir. 2000)).[5] The record simply fails to compel a conclusion contrary to that reached by the IJ and the BIA.

---

[5] For applications filed after the REAL ID Act's effective date of May 11, 2005, the statute provides that an IJ may base a credibility determination on the demeanor or responsiveness of the applicant, the inherent implausibility of the account, consistency between the applicant's written and oral statements, the consistency of the applicant's statements with other evidence on the record, and any inaccuracies or falsehoods, all "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicants claim, or any other relevant factor." 8 U.S.C. § 1158(b)(1)(B)(iii); see REAL ID Act § 101 (h)(2) (the new asylum provisions of the REAL ID Act to applications filed after May 11, 2005).

Petitioner claims that both the IJ and the BIA failed to consider the totality of the circumstances when denying her application for relief. Record evidence, however, shows the contrary. Substantial evidence supports the BIA's finding that Petitioner failed to meet her burden of proof establishing eligibility for relief and protection from removal. The IJ and the BIA made adverse credibility findings based on specific, cogent reasons, including a number of inconsistencies in the record, which Petitioner was given ample opportunity to rebut. She failed to do so.

For instance, the IJ continued Petitioner's hearing on two separate occasions to give Petitioner the opportunity to corroborate her testimony with credible evidence. At the first hearing, the IJ told Petitioner exactly what his issues with the evidence presented were and gave Petitioner time to address them. The IJ went as far as suggesting several avenues Petitioner's counsel could take in doing so. Nonetheless, Petitioner presented insubstantial evidence at the second and third hearings. Petitioner introduced the "originals" of the same documents that were submitted along with her application for asylum (and found to be fraudulent by the Report) and a polygraph report, which was afforded less weight because Petitioner did not establish either the expertise or competence of the individual administering the test, or the circumstances under which the test was administered. Given three occasions to provide credible evidence, Petitioner could not satisfy the

threshold required by the IJ.  However, Petitioner maintains that the credibility determination reached by the IJ and the BIA was nonetheless based on speculation and conjecture.

In support, Petitioner relies on Tang, 578 F.3d at 1270,[6] where, similar to the facts before us, we reviewed a BIA decision dismissing an appeal of an IJ's denial of an application for asylum and withholding of removal.  Id. at 1273.  In Tang, however, the inconsistencies we found were in the grounds on which the IJ based its credibility determination, id. at 1281, none of which are present here. The inconsistencies on these facts lie in Petitioner's own testimony and evidence. Moreover, the petitioner in Tang was able to provide credible medical records confirming the injuries she suffered in China due to the religious persecution she faced there.  Id. at 1275.  Here, Petitioner could not provide accurate and credible medical records to rebut the State Department's Report showing that her documents were fraudulent.

Petitioner's next contention is that the agency did not consider the 2009 Department of State report on human rights practices in the Ukraine, which was

---

[6] Petitioner also cites Farquharson v. U.S. Att'y Gen., 246 F.3d 1317 (11th  Cir. 2001) for the premise that the Board's decision demonstrates a completely inaccurate perception of the record, which compels reversal.  Farquharson is inapposite; it is a criminal case that involved an illegal entry without inspection and conviction for a controlled substance violation. Id. at 1321. It is of no consequence to the discussion before this Court.

submitted to show corruption in the Ukrainian government. Petitioner's argument that, if considered, it would have explained her failure to provide corroborating evidence is unavailing. First, Petitioner fell short of providing any credible evidence, from an independent source, that would compel a reversal on that ground. Cf. Kaczmarczyk v. INS, 933 F.2d 588, 595 (7th Cir. 1991) ("We note that agency action is entitled to a presumption of regularity, and thus the burden is on the petitioners to convince us that the BIA gave short shrift to the evidence they presented.") (internal citations omitted). Additionally, the record does not support Petitioner's contention that the proffered country conditions evidence was ignored. Petitioner acknowledges that the IJ addressed her theory that the Ukraine's public healthcare system explained her sparse medical records and the United States Embassy's inability to confirm her treatment at the Ternopil city hospital. The IJ and the BIA found that, even assuming the police might wish to cover up its failure to investigate Petitioner's rape, nothing in the country conditions evidence suggested that medical institutions in the Ukraine are in collusion with the government. They found that, while it might be reasonable that a corrupt police agency would not verify its own misdeeds, Petitioner's allegation of a cover-up by the medical institution was mere speculation. Thus, Petitioner's claim that the BIA ignored her country conditions evidence is unfounded.

14

Petitioner's country conditions argument is also unavailing because, while she urges the Court to accept the contention that corruption in the Ukraine is too rampant to secure any credible information from them, she urges that we accept the uncorroborated evidence she secured through her own sources. There is either too much corruption to secure any documents or they are available through diligent research. Based on the totality of the circumstances, both the IJ and the BIA weighed the evidence of authenticity and determined that the State Department's Report was more credible than Petitioner's testimony and the claims of her family. Their determinations were not based on any single source or inconsistency, but on substantial record evidence. We find no reason to disturb these rulings. We therefore affirm the denial of relief as to this issue.

## B.

Next, Petitioner argues that the Investigator disclosed her name to Ukrainian officials during the course of his investigation, violating the confidentiality provision pertaining to asylum applicants, 8 C.F.R. §1208.6(a). In its review of the case, the BIA noted that the Investigator stated that he was aware of the confidentiality requirement and complied with it. Upon consideration, the BIA determined that the investigation was conducted appropriately. Specifically, the BIA found that the objective of verifying police and medical records was satisfied,

15

and that the methods used in conducting the investigation, contacting Ukrainian officials, and circumstances surrounding the request for information were also proper.

On appeal, Petitioner does not point to any compelling evidence that would lead this Court to disturb the BIA's determination. Under the confidentiality requirement of 8 C.F.R § 1208.6(a),

> Information contained in or pertaining to any asylum application, records pertaining to any credible fear determination conducted pursuant to § 1208.30, and records pertaining to any reasonable fear determination conducted pursuant to § 1208.31, shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Attorney General.

8 C.F.R § 1208.6(a). Courts generally accord government records and official conduct a presumption of legitimacy. See Averianova, 509 F.3d at 897 (citing U.S. Dep't of State v. Ray, 502 U.S. 164, 179 (1991)). Courts also give substantial deference to the BIA's interpretation of its statutes and regulations. See Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945).

Although this is an issue of first impression for this Circuit, there are a few decisions from sister Circuits that provide some instruction. See e.g., Averianova, 509 F.3d at 897 (finding that disclosure of applicants names and dates of birth did not give rise to such an inference); Lin v. U.S. Dep't of Justice, 459 F.3d 255, 270

(2d Cir. 2006) ("Many documents, such as birth certificates, marriage licenses, or even some court records, do not necessarily imply that a foreign national is seeking asylum."); Che v. Mukasey, 532 F.3d 778 (8th Cir. 2008) (finding that the agency's conclusion that confidentiality regulations were not breached should not be disturbed because the applicants name could be linked to many documents and did not necessarily imply that the applicant was seeking asylum).

In Averianova, the petitioners' claims for breach of confidentiality failed because the record did not show that the INS had disclosed any information contained in or pertaining to an asylum application. Id. at 898. Therefore, the Eight Circuit held that the disclosure of the applicants' names and dates of birth could not establish a breach. In its decision, the Eight Circuit relied on an INS memorandum interpreting its own regulation ("Cooper Memo"), which lists specific scenarios when disclosure of an applicant's information does rise to the level of a breach.[7] According to the Cooper Memo, a breach occurs when information is disclosed to a third party and the disclosure is significant enough that it allows the third party to connect the identity of the applicant to: (1) the fact

---

[7] See Memorandum from Bo Cooper, INS General Counsel, to Jeffrey Weiss, INS Director of Int'l Affairs, Confidentiality of Asylum Applications and Overseas Verification of Documents and Applications Information (June 21, 2011), available at http://judiciary.house.gov/legacy/82238.pdf at 39-45.

that the applicant is seeking asylum; (2) specific facts or allegations pertaining to the individual asylum claim in the application; or (3) facts or allegations that are sufficient to give rise to a reasonable inference that the person is seeking asylum. Averianova, 509 F.3d at 899 (citing Lin, 459 F.3d at 263).

Here, at most, the disclosure of Petitioner's name was made to a hospital administrator (to determine if she had ever been treated at that facility) but not to police officials or other government actors. Petitioner would have this Court equate disclosure to a hospital administrator with disclosure to a government official and presume a violation. Such an argument is a non-starter, particularly under the facts at issue here. Petitioner did not present any evidence showing that hospitals are in the business of covering up government actions. On these facts, even if this was a disclosure, it does not give rise to the inference that Petitioner applied for asylum. Disclosure of a person's name is not sufficient for a breach of confidentiality; indeed without disclosure of a name, investigating these claims would be impossible. There might be many other reasons to request such medical information, such as an investigation relating to adoption or guardianship of a child, and asylum is not among the more obvious. See Averianova, 509 F.3d at 894 (requesting copies of birth records does not give rise to a reasonable inference of an asylum application because the documents "could relate to any number of

18

ordinary government investigations"). Regardless, Petitioner contends that, because she lives in a small town in the Ukraine, everyone would necessarily know that the Investigator was seeking information in connection with her application for asylum. In order to succeed on her claim, Petitioner needed to demonstrate that the disclosure in question gave rise to a reasonable inference that the person in question applied for asylum, and she failed to do so.

Similarly, Petitioner's claim is distinguishable from the Second Circuit's decision in Lin. There, the court found that Lin's confidences were violated because the INS provided the Chinese government with a document that is typically associated with asylum claims. Lin, 459 F.3d at 262. Here, however, the record does not reflect that the Investigator provided any documents to any government officials in connection with his investigation. Nor did the Investigator's inquiries disclose any facts that would lead one to conclude that Petitioner was applying for asylum.

Accordingly, we find that Petitioner did not overcome the presumption of regularity afforded to government investigations. Therefore, we affirm the BIA's finding that Petitioner's right to confidentiality in the asylum application process was not breached.

IV.

19

In conclusion, we affirm the findings of the IJ and the BIA denying relief.

**AFFIRMED.**