[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12770

Non-Argument Calendar

_____

RIZWAN AHMED,

                                                                    Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

                                                                    Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A216-273-526

_____

Before JORDAN, NEWSOM, and HULL, Circuit Judges.

PER CURIAM:

Rizwan Ahmed, a native and citizen of Pakistan, seeks review of the Board of Immigration Appeals' ("BIA") final order that affirmed the immigration judge's ("IJ") denial of his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA") and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). The IJ determined that Ahmed was not credible and denied relief. On appeal, Ahmed challenges the IJ's adverse credibility finding. After careful review of the record, we deny Ahmed's petition.

## I.    GENERAL PRINCIPLES

Before reviewing Ahmed's claims, we set forth the applicable principles for his petition.

### A. *Applications for Asylum, Withholding of Removal, and CAT Relief*

An asylum application must show, with specific and credible evidence, either past persecution or a well-founded fear of future persecution on account of one of the protected grounds. *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286-87 (11th Cir. 2005).

Similarly, an applicant for withholding of removal bears the burden of showing that it is more likely than not that the applicant

will be persecuted or tortured because of a protected ground upon being returned to his or her country. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1232 (11th Cir. 2005). Under CAT, the applicant must show that it is more likely than not that he or she would be tortured if removed. 8 C.F.R. § 208.16(c).

## B. Adverse Credibility Findings

An adverse credibility determination standing alone is sufficient to support the denial of an asylum application when there is no other evidence of persecution. *Forgue*, 401 F.3d at 1287. If, however, the applicant submits other evidence of persecution, the IJ must consider this evidence as well. *Id.*

To determine whether an applicant's testimony is credible, the IJ may consider the totality of the circumstances and all relevant factors, including: (1) the applicant's demeanor, candor, and responsiveness; (2) the plausibility of the applicant's testimony; (3) the consistency between the applicant's oral and written statements, whenever made; (4) the internal consistency of each statement; (5) the consistency of the applicant's statements with other evidence in the record; and (6) any inaccuracies or falsehoods in the applicant's statements. INA § 208(b)(1)(B)(iii), 8 U.S.C. § 1158(b)(1)(B)(iii).[1] The inconsistencies, inaccuracies, or

---

[1] The IJ's credibility findings for purposes of determining eligibility for withholding of removal are also governed by 8 U.S.C. § 1158(b)(1)(B). INA § 241(b)(3)(C), 8 U.S.C. § 1231(b)(3)(C).

falsehoods need not go to the heart of the applicant's claim. *Id.* Further, an applicant's tenable explanation of the inconsistencies in his testimony will not necessarily undermine an adverse credibility determination, especially in light of a lack of corroborating evidence. *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1233 (11th Cir. 2006).

In making an adverse credibility finding, the IJ "must offer specific, cogent reasons" for the finding. *Forgue*, 401 F.3d at 1287. Once an adverse credibility finding is made, "the burden then shifts to the alien to show that the IJ's credibility determination was not supported by 'specific, cogent reasons' or was not based on substantial evidence." *Chen*, 463 F.3d at 1231 (quoting *Forgue*, 401 F.3d at 1287).

## C.  Standard of Review

We review factual determinations, which include credibility determinations, under the substantial evidence test. *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1254-55 (11th Cir. 2006). We must affirm findings that are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (quotation marks omitted). We must view the record "in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Id.* at 1255 (quotation marks omitted). We will overturn a credibility finding only if the record compels it. *Id.* "[T]he mere fact that the record may support a

contrary conclusion is not enough to justify a reversal of the administrative findings." *Id.* (quotation marks omitted).[2]

## II.    AHMED'S CLAIMS

Before the IJ, Ahmed's claims for relief were based on his religion.  According to Ahmed, while living in his family's village in Punjab, Pakistan, his friend "Mati" introduced him to Shiism and Ahmed was converted from Sunnism to Shiism on July 28, 2017. As a result, Ahmed's family, who were devout Sunni Muslims, locked Ahmed in his room and beat him for seven days to force him to renounce Shia Islam.  When Ahmed refused, on August 5, 2017, his family turned him over to a fundamentalist Sunni organization, Lashkar-e-Jhangvi ("LeJ"), which imprisoned and tortured him for two days.  Before releasing Ahmed, LeJ members told him that if he did not convert back to Sunni Islam and join LeJ within two days, they had his family's permission to kill him.

After his release on August 7, 2017, Ahmed, with help from Mati, fled Pakistan on August 10, 2017 and travelled through South and Central America and Mexico, before entering the United States on November 27, 2017.  Ahmed claimed he feared he would be attacked, tortured, and killed by Sunnis or his own family if he returned to Pakistan.

---

[2] Because the BIA agreed with the IJ's credibility finding, we review the decisions of both the BIA and the IJ. *Mohammed v. U.S. Att'y Gen.*, 547 F.3d 1340, 1344 (11th Cir. 2008).

6                    Opinion of the Court                    21-12770

In Ahmed's case, the IJ gave specific and cogent reasons for finding Ahmed's account not credible.[3]    The IJ identified inconsistencies within Ahmed's hearing testimony about: (1) whether he worked and how often he traveled to pray at the Shia Imam Bargah (place of worship) the week before his conversion; (2) whether he had attended university; (3) his reasons for acquiring the passport he used to leave Pakistan; and (4) how he acquired his passport.  The IJ also identified inconsistencies between Ahmed's hearing testimony and other record evidence about: (1) whether his family also converted to Shiism and were kicked out of the village with him or were devout Sunnis who participated in his abuse in Pakistan; (2) whether his family supported or opposed LeJ's use of violence against him; and (3) whether the Pakistani police would help him if he were attacked.

Finally, the IJ found implausible Ahmed's testimony that: (1) he left his passport, an important identifying document, at his friend Mati's house for months before leaving Pakistan; (2) his passport was taken while he was traveling in the Panamanian jungle; (3) LeJ posted banners seeking information about Ahmed using a picture of Ahmed LeJ had taken while he was detained and being brutally tortured; and (4) in 2019, almost two years after

---

[3] To the extent that Ahmed's petition assumes his credibility and argues that he established his eligibility for asylum, withholding of removal, and CAT relief, we do not consider his arguments because the BIA did not reach these issues.

Ahmed fled Pakistan, 30 to 40 of these banners were still posted throughout his village.

The IJ denied Ahmed's application for relief from removal, and Ahmed appealed to the BIA. The BIA found that the IJ's credibility finding was not clearly erroneous, citing the many "inconsistencies and implausibilities" identified by the IJ.

All of these reasons for the IJ's credibility determination find support in the record. For example, at the removal hearing, Ahmed testified that after he converted to Shia Islam, his family of devout Sunnis held and abused him, turned him over to LeJ to torture him, and gave LeJ permission to kill him if he did not convert back to Sunni Islam. Yet, in an interview with a border patrol agent one day after he was caught entering the United States, Ahmed said that he had entered the United States because he *and his family* were "kicked out" of their village "for being Shia Muslims."

The IJ did not ignore Ahmed's explanation for this inconsistency—that he had trouble understanding the interpreter during the border interview because the interpreter was not fluent in Urdu. Rather, the IJ was not persuaded by this explanation because Ahmed was able to properly answer all of the other questions posed to him during the interview. The IJ's reason for rejecting Ahmed's explanation for the inconsistency is supported by the record. Ahmed's sworn statement indicates the presence of an interpreter who provided translation in Urdu and that Ahmed answered all of the border patrol agent's questions.

A statement from Ahmed's friend Mati also contradicted Ahmed's testimony about his family. Mati's statement did not describe any abuse by Ahmed's family. Instead, according to Mati, Ahmed's family merely "encouraged" Ahmed to return to his previous faith, and, while LeJ "put pressure" on Ahmed's family, the "family disagreed with [the] violence against him."

Ahmed also submitted a picture of a banner he claimed LeJ had posted in his village in Pakistan. The banner contained an announcement by LeJ that Ahmed had joined the Shia Muslims and offered a reward for information about him. Ahmed said his friend Mati had taken the picture of the banner in January 2019, when 30 to 40 of them were posted throughout the village.

The banner included a photograph of Ahmed in a suit, appearing well-groomed, sitting upright, and looking directly at the camera. Ahmed first testified that LeJ took this photograph of him with a cell phone while he was detained in August 2017. When pressed, however, he suggested LeJ may have obtained the picture from his family and claimed he could not remember when or where the photograph was taken.

The IJ found Ahmed's testimony about the banners not credible because Ahmed had said that while he was held by LeJ, he was severely beaten, tortured with multiple electric shocks and burns, his shoulder was broken, and he was in very bad physical condition. Yet, as Ahmed does not dispute, the photograph of him supposedly taken by LeJ and used on their banner did not show any signs of injury or duress.

In another example, Ahmed testified that the Pakistani police would not protect him because they supported LeJ.  Ahmed knew this because the LeJ leader who visited him, while he was being detained and tortured, was accompanied by the police.  In addition, the police had watched while LeJ beheaded another man in Ahmed's village for converting to Shia Islam.  The IJ discredited this testimony as inconsistent with a "Police Clearance Certificate" in the record.  The police in Ahmed's district issued the certificate to Ahmed, certifying that he had no criminal record.  The stated purpose of the certificate was so that Ahmed could "[p]roceed[] to the USA."  In other words, the police Ahmed claimed would not protect him actually helped him by issuing a certificate that could help him gain admittance to the United States.

Sometimes, Ahmed's own hearing testimony was contradictory or confusing.  For instance, Ahmed initially testified that in the six days before his conversion to Shia Islam, he did not work and attended prayers at a Shia Imam Bargah once each day and then prayed at home twice each day.  Shortly thereafter, however, Ahmed testified that he had worked all that week and that he had not gone to the Imam Bargah every day to pray.

Also, Ahmed first testified that he attended school through the tenth grade, never went to college, and worked in Pakistan as a plumber.  Later, however, Ahmed testified that he began talking to Mati about converting to Shia Islam while they both attended the Allama Iqbal Open University.  When the IJ pointed out this contradiction, Ahmed said that although the school was called a

university, it was an online program that enrolled students from first grade up to the university level and that he had merely completed the tenth grade through the university.

Ahmed's testimony about the passport he used to flee Pakistan also proved problematic. First, he contradicted himself about how he obtained the passport. Ahmed initially said he obtained his passport himself even though he did not need it at the time. Later, however, Ahmed said that his family obtained his passport for him because they wanted to send him to work in Dubai.

Second, Ahmed offered a convenient explanation for how he already had his passport when LeJ released him and did not need to return to the family home. Specifically, Ahmed testified he left his village the same day he was released and, with Mati's help, went directly to Karachi, where he boarded a plane carrying only his passport. When the IJ asked if Ahmed first had returned home to get his passport, Ahmed said that Mati already had his passport. Ahmed explained that, after he obtained his passport in 2015, he liked to carry it around in his pocket wherever he went. Once, after showing his passport to Mati, Ahmed mistakenly left it at Mati's house, where it remained for eight months. Ahmed claimed that leaving his passport with Mati was "no big deal" because they were "good friends" who "share[d] things" and he could get it whenever he needed it. The IJ found Ahmed's explanation "that he just simply left his passport there because he was friends with Mati, and he didn't know why he left his passport there" unbelievable.

Finally, Ahmed offered a convoluted and improbable story about losing his passport to explain how it ended up in the custody of the Department of Homeland Security ("DHS"). Specifically, Ahmed claimed that while traveling in a jungle in Panama, thieves, whom he referred to as "mafia," robbed him of his bags and took away his passport. Ahmed kept the telephone number of Mati's friend in Brazil on the cover of his passport. After taking the passport, the mafia called this number and offered to return the passport in exchange for money. Mati's friend agreed and sent the mafia money provided by Mati. The mafia sent the passport to Mati's friend in Brazil, who then mailed it to Ahmed's attorney in the United States. Ahmed acknowledged that DHS now had custody of the passport and suggested the government "came across" his passport and "put it in the file." The IJ found Ahmed's account of what happened to his passport "completely unbelievable on its face."

Given the numerous inconsistencies within Ahmed's testimony and between his testimony and the other record evidence, the record does not compel a conclusion that Ahmed testified credibly. Although Ahmed argues that he provided plausible explanations for some of the inconsistencies, the IJ was not required to accept them. In any event, a tenable explanation does not compel us to overturn the IJ's credibility finding. *See Chen*, 463 F.3d at 1233; *see also Lyashchynska v. U.S. Att'y Gen.*, 676 F.3d 962, 967 (11th Cir. 2012) ("Where there are two

permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (quotation marks omitted)).

Ahmed argues that any inconsistencies and implausible testimony concerning his passport were not central to his claims for relief. An adverse credibility finding may be based on any inconsistencies, regardless of whether they go to the heart of the applicant's claim. *See* INA § 208(b)(1)(B)(iii), 8 U.S.C. § 1158(b)(1)(B). Further, other inconsistencies the IJ identified were not minor, but related directly to key events of Ahmed's religious persecution claims.

The reasons for discrediting Ahmed are supported by substantial evidence, and Ahmed does not contend that the other evidence in the record, absent his discredited testimony, compels a conclusion that he is eligible for asylum, withholding of removal, or CAT relief.

**PETITION DENIED.**