# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-1832

_____

Liban N. Ali

*Petitioner*

v.

Eric H. Holder, Jr., Attorney General of the United States

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: October 8, 2014
Filed: January 8, 2015

_____

Before MURPHY, SMITH, and GRUENDER, Circuit Judges.

_____

SMITH, Circuit Judge.

Petitioner Liban Nor Ali applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). The Immigration Judge (IJ) denied Ali's applications. Ali appealed to the Board of Immigration Appeals (BIA), which affirmed the IJ's decision. Ali now petitions for review, arguing that substantial evidence does not support the denial of his applications. We deny the petition.

I. *Background*

Ali is a native of Somalia and member of the Tumal clan, a clan Ali describes as a "minority clan" that is "small and weak" compared to other Somali clans. On September 21, 2009, Ali arrived at the United States-Mexico border and applied for admission to the United States. Ali provided a sworn statement to an officer of the Department of Homeland Security (DHS). In the statement, Ali identified himself and testified that members of the Hawiye clan persecuted him in 2003 and 2009. He also described his subsequent travels from Somalia to the United States. On November 4, 2009, a DHS asylum officer further questioned Ali during what DHS terms a "credible fear interview" about the clan-based persecution Ali claimed he suffered in Somalia. The DHS commenced removal proceedings two days later by serving Ali with a Notice to Appear. The Notice to Appear alleged that Ali had willfully misrepresented material facts to procure entry into the United States and was removable under § 212(a)(6)(C)(i) and § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("Act").

On April 27, 2010, however, Ali filed applications for asylum, withholding of removal, and protection under the CAT. Ali testified before the IJ on February 8, 2011, and April 6, 2011, in support of his applications.

A. *Alleged 2003 Persecution*

Ali claims that members of the Hawiye clan once attacked him and his father in 2003. Initially, Ali testified that the Hawiye men shot his father, injured Ali with "the tip of the gun," and then took Ali and his father "to the north," where Ali's "father was hospitalized and treated." Ali stated that he believed the Hawiye men attacked him and his father because they "wanted some valuables or money from us."

Later, however, when recounting the same incident to the asylum officer, Ali testified that the Hawiye men "injured [his] father and left him thinking he was dead." He also testified that the Hawiye men attacked him and his father because they "were

men who lived there and knew" that Ali and his father were members of the Tumal clan.

Ali later testified to the IJ that, although he did not recognize his attackers and they said nothing that indicated they were Hawiye, Ali nevertheless believed they were Hawiye "[b]ecause they were armed. And they were the men who ruled that area —the city." But Ali admitted during cross examination that "[y]ou can't tell [what clan people belong to], unless you know the people or those people live there where you live." Ali also testified that, after his attackers shot his father and used a "bayonet to hit [Ali] in the leg," the attackers simply "left." Ali then testified that "some men" (whom Ali did not know) thereafter took both him and his father to a hospital for treatment. Ali had no records of the treatment, even though he admitted during cross examination that the hospital would ordinarily give "some papers, like prescriptions."

## B. *Alleged 2009 Persecution*

Ali claims that Hawiye men also attacked him and other family members at their house in 2009. According to Ali, the men kidnapped and beat Ali and killed his brother Farah. The men also threatened to kill Ali unless they received a ransom payment. Ali initially testified to the DHS that the attackers released him only when "the elderly and [his] family got ransom money."

Ali testified to the asylum officer that the attackers were "asking for money" and stated that they would kill Ali and his family if they did "not move away from the neighborhood." The attackers then allegedly kidnapped Ali, "cut" him, and released him only when "a neighbor" spoke with them and "gave them money."

Ali first testified to the IJ that the attackers did *not* verbally ask for money, but they simply "started searching" for money instead. Ali then changed his testimony, stating that the attackers actually "asked where we keep—we would keep our savings. Yes. They asked that." Ali testified that he suffered "no physical injuries at that time."

He also testified that his attackers released him only when a man named Sadaq, a Hawiye man, paid the attackers to release Ali.

## C. *Ali's Travels*

Ali initially testified to the DHS that "the men" who paid his ransom in 2009 also paid someone to smuggle Ali into Ethiopia. After Ali arrived in Ethiopia, certain "elderly gentlemen" then paid $8,200 to smuggle Ali from Ethiopia to the United States. Ali claims he then flew from Ethiopia to Turkey, and from Turkey to Brazil. Ali testified that, after he arrived in Brazil, he took a direct flight from São Paulo, Brazil to Tegucigalpa, Honduras. Ali then traveled by vehicle through Guatemala and Mexico before arriving at the United States.

Before the IJ, Ali first testified that his uncle in Ethiopia gave him $5,500 for travel expenses. Ali later testified during the same hearing, however, that his uncle actually gave him $8,200 to fund his travels. When asked during cross examination whether he stopped "in any other countries" during his flight from São Paulo to Tegucigalpa, he testified "No. It was—there was none." Ali's story changed, however, after the government produced evidence that there were, in fact, *no* direct flights between São Paulo to Tegucigalpa at the time he allegedly traveled; indeed, Ali then testified that he could no longer recall whether it was a direct flight because he "was tired" during his travels.

## D. *Ali's Birth Certificate*

Ali told the IJ that he "did not have any documents" with him when he arrived at the border of the United States, other than a document he had received from "Mexican Immigration." He also testified that he "left [his birth certificate] in Mexico" and that it was "taken away from [him] by [Mexican] Immigration." During cross examination, however, Ali testified that Mexican Immigration actually returned his birth certificate to him, but that the certificate was later "washed away with the clothing [Ali] was washing." The DHS then introduced an exhibit during the hearing

-4-

that Ali positively identified as his supposedly lost birth certificate. Ali could not explain how the United States government obtained the certificate. In fact, Ali then testified that, rather having lost it in the wash, he actually had *thrown away* the birth certificate while in Mexico because it broke into pieces when he washed it.

### E. *Procedural History*

The IJ denied Ali's applications, finding, among other things, that Ali was not credible based on inconsistencies in his testimony and the general lack of corroborating evidence supporting his testimony. Ali appealed the IJ's denial to the BIA. The BIA "easily [found] no clear error in the [IJ's] adverse credibility determination" and affirmed the IJ's decision.

### II. *Discussion*

We will affirm the decisions of the IJ and BIA if they are supported by substantial evidence in the record. *Averianova v. Mukasey*, 509 F.3d 890, 894 (8th Cir. 2007). "We review questions of law de novo, and we will reverse findings of fact only if the evidence is 'so compelling that no reasonable fact finder could fail to find in favor of the petitioner.'" *Id.* (quoting *Turay v. Ashcroft*, 405 F.3d 663, 666–67 (8th Cir. 2005)).

Ali argues primarily that the IJ's adverse credibility determination is not supported by substantial evidence and that the IJ therefore erred in denying his applications for asylum and withholding of removal. After analyzing the record as a whole, we disagree and conclude that substantial evidence supports the IJ's credibility determination.

### A. *Asylum*

The Attorney General has "discretion to grant asylum to a refugee, defined as an alien who is unable or unwilling to return to [his] home country because of past persecution or a well-founded fear of future persecution on account of race, religion,

nationality, membership in a particular social group or political opinion." *Onsongo v. Gonzales*, 457 F.3d 849, 852 (8th Cir. 2006) (citation omitted); *see also* 8 U.S.C. § 1158(b)(1)(B)(i). "The combination of an adverse credibility finding and a lack of corroborating evidence for the claim of persecution means that the applicant's claim fails, 'regardless of the reason for the alleged persecution.'" *Averianova*, 509 F.3d at 895 (quoting *Sivakaran v. Ashcroft*, 368 F.3d 1028, 1029 (8th Cir. 2004)). "An applicant bears the burden of satisfying the IJ that [his] 'testimony is credible . . . .'" *Id*. (quoting 8 U.S.C. § 1158(b)(1)(B)(ii)). "The IJ 'is in the best position to make credibility findings because [she] sees the witness as the testimony is given.'" *Fesehaye v. Holder*, 607 F.3d 523, 527 (8th Cir. 2010) (alteration in original) (quoting *Gemechu v. Ashcroft*, 387 F.3d 944, 947 (8th Cir. 2004)). Consequently, we defer to the IJ's credibility determination when, as is the case here, the determination is supported by "specific, cogent reasons for disbelief." *Onsongo*, 457 F.3d at 852 (8th Cir. 2006) (citation omitted).

Ali provided contradictory testimony about the persecution that he allegedly suffered in 2003 and 2009. With respect to the alleged 2003 persecution, for instance, Ali first testified that after the attackers injured him and his father, the attackers "took [them] to the north." Later, however, Ali testified that the attackers "injured [his] father and left him thinking he was dead." Ali then testified that his attackers, in fact, "left [him and his father] while [they] were lying down" and that other people took both him and his father to the hospital for treatment. Ali's testimony about the alleged 2009 persecution is similarly problematic: When asked during the IJ hearing whether his attackers verbally asked "for money," Ali first testified that they did not. But when asked the same question later, Ali responded "Yes. Yes. Yes. They asked where we keep—we would keep our savings. Yes. They asked that."

Ali also provided inconsistent testimony with respect to his travels from Somalia to the United States. Ali first testified that his uncle in Ethiopia gave him $5,500 to fund his travels; however, he later testified that his uncle, in reality, gave

-6-

him $8,200. Likewise, although Ali first testified unequivocally that he took a direct flight from São Paulo to Tegucigalpa, he suddenly could no longer recall whether he took a direct flight after the government introduced evidence that no such flight existed at the relevant time. These statements are difficult to reconcile. Of course, such facts may seem like minutiae, or, as Ali argues, seemingly have "little to do with his credibility"; however, the Act expressly provides that "a trier of fact may base a credibility determination on," among other things, "the consistency between the applicant's or witness's written and oral statements . . . and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." 8 U.S.C. § 1158(b)(1)(B)(iii).

Ali's crucial testimony about his national origin also proved problematic because of facts surrounding his birth certificate. Ali purportedly brought it from Somalia to establish his identity to United States officials. Yet Ali's memory with respect to this critical document was inconsistent at best. Indeed, first Ali testified that he "left [his birth certificate] in Mexico" because it was "taken away from [him] by [Mexican] Immigration." But Ali then testified that Mexican Immigration actually returned the certificate to him. Ali also testified at one point that the certificate "washed away with the clothing [Ali] was washing." After the government introduced his birth certificate at the IJ hearing, however, Ali testified (somewhat inexplicably) that he, in fact, had "thr[own] it away" while in Mexico.

Ali provided no documentation to bolster the credibility of his testimony with respect to either his travels or the alleged persecution that he suffered. Ali failed to provide, for instance, a receipt, itinerary, stamped passport, ticket, or any other document related to any of the flights he purportedly took to ultimately arrive at the United States border. He also proffered no hospital or treatment records, no contemporaneous writings or records, and no affidavits from family members or anyone else about the alleged persecutions or subsequent medical care that he

received in either 2003 or 2009. Lack of documentation for his treatment in Somalia is understandable given that nation's current status. Ali should have been able to provide some documentary evidence of his travels, however, via subpoena or other means. This lack of "corroborating evidence," especially when coupled with Ali's inconsistent testimony, supports the denial of his applications. *See Averianova*, 509 F.3d at 895 ("The combination of an adverse credibility finding and a lack of corroborating evidence for the claim of persecution means that the applicant's claim fails, 'regardless of the reason for the alleged persecution.'" (quoting *Sivakaran*, 368 F.3d at 1029)); *see also Khrystotodorov v. Mukasey*, 551 F.3d 775, 784 (8th Cir. 2008).

In sum, Ali's inconsistent testimony and lack of corroborating evidence provide the requisite "significant evidence" to support the IJ's adverse credibility determination.

## B. *Withholding of Removal*

"When asylum, withholding of removal, and CAT claims are based on the same discredited testimony, 'the adverse credibility finding is fatal to all three claims.'" *Zine v. Mukasey*, 517 F.3d 535, 541 (8th Cir. 2008) (quoting *Fofanah v. Gonzales*, 447 F.3d 1037, 1040 (8th Cir. 2006)). Moreover, the "standards of proof for withholding of removal and relief under the CAT are more stringent than the standard for asylum." *Cooke v. Mukasey*, 538 F.3d 899, 908 (8th Cir. 2008) (citation omitted). Thus, Ali's failure "to meet the least demanding burden of proof for the asylum claim" is fatal to his claims for withholding of removal and protection under the CAT as well. *Id.* (citations omitted).[1]

---

[1]It is unclear whether Ali is challenging the IJ's determination with respect to his CAT claim; in any event, his CAT claim would fail for the reasons specified above.

-8-

### III. *Conclusion*

For the foregoing reasons, we deny Ali's petition for review.

_____