# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1021

_____

Mario Garcia-Solorzano, also known as Sergio Garcia

*Petitioner*

v.

Loretta E. Lynch

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: November 17, 2016
Filed: February 7, 2017
[Unpublished]

_____

Before RILEY, Chief Judge, WOLLMAN and KELLY, Circuit Judges.

_____

PER CURIAM.

Mario Garcia-Solorzano, a native and citizen of Mexico, petitions for review of a decision by the Board of Immigration Appeals (BIA) denying his application for withholding of removal. Garcia-Solorzano contends that the BIA erred in affirming the Immigration Judge's (IJ's) adverse credibility finding. We deny the petition.

Garcia-Solorzano was detained after a traffic stop in April 2013. The Department of Homeland Security (DHS) thereafter notified him of its intent to reinstate an order of deportation that had previously been entered against him. The notice alleged that Garcia-Solorzano was removable because he had twice illegally reentered the United States after having been removed pursuant to a December 1995 deportation order.

While detained, Garcia-Solorzano indicated that he feared returning to Mexico, and he was referred to an asylum officer for an interview. At the beginning of the interview, Garcia-Solorzano indicated that although he was ill with the flu he was able to proceed. Garcia-Solorzano testified that he was born in 1972 and grew up in El Monteal, Mexico, where the Zetas gang expected him to join their ranks. Garcia-Solorzano explained that relatives on his father's side of the family were Zetas—"[u]ncles, cousins, nephews"—and that his grandfather was a member of the state police force and also a member of the Zetas.

Garcia-Solorzano told the asylum officer that he first came to the United States in 1991, a few years after he was threatened by the Zetas. According to Garcia-Solorzano, ten or fifteen masked Zetas had confronted him when he was fourteen years old. They "grabbed [him], asked [him] to kneel down and they put a pistol on [his] head." When asked whether the Zetas had ever hurt anyone else in his family, Garcia-Solorzano replied that the Zetas had killed one of his brothers in October 1996. He testified that he had two brothers still living in Mexico—one with his mother in El Monteal and one in Mexico City—and a sister who lived in the United States. The asylum officer found that Garcia-Solorzano had established a reasonable fear of persecution on account of his membership in a particular social group consisting of "family members of current and active Zetas." Garcia-Solorzano's case thus was referred to an immigration judge for full consideration of his request for withholding of removal. See 8 C.F.R. § 208.31(e).

-2-

Garcia-Solorzano thereafter completed an application for withholding of removal, which stated that he feared returning to Mexico because the Zetas would kill him if he refused to join their criminal enterprise. He explained that he had been threatened and recruited by his "maternal grandfather and various uncles and cousins," who were members of the Zetas, noting again that his grandfather was a sergeant in the state police force. The threats started when Garcia-Solorzano was eight years old and continued until he was sixteen. Garcia-Solorzano stated that upon being deported in 1996, he returned immediately to the United States, and that when he was removed in 2008, he hid for two months in a closet in his mother's home and again returned to the United States as soon as he was able to do so.

Garcia-Solorzano's personal statement submitted in support of his application explained that his maternal grandfather and his uncles and cousins from both sides of the family had threatened him. He reported that he had been held at gun point at age fourteen, that he was threatened repeatedly until he was sixteen years old, that his brother was murdered in 1996, and that he hid at his mother's home for two months after he was removed from the United States in 2008.

During his hearing before the IJ, Garcia-Solorzano testified that the Zetas began forcing him to train with them when he was eight years old. He was taught to shoot and was beaten when he tried to refuse the training. According to Garcia-Solorzano, relatives from both his mother's side and his father's side of the family were involved with the Zetas, but he believed that his maternal grandfather was especially threatening. When asked whether he had been physically harmed by the Zetas, Garcia-Solorzano replied, "They will hit me over the head like this, kind of like with a pistol on the head. . . . Sometimes with the butt of the pistol or with the hand whenever he was mad."

Garcia-Solorzano testified that his relatives focused on recruiting him—rather than his brothers or cousins—because he "was [his] grandfather's favorite one because

[he] was born first." He witnessed his grandfather and uncles kill a married couple and beat people "to take their stuff, their cars, their homes," but he never saw them traffic drugs. Garcia-Solorzano testified that he left home when he was sixteen, worked for three years along the border, and paid a "coyote" to bring him to the United States. According to Garcia-Solorzano, the Zetas killed his brother, Artaneo, and beheaded his sister, Elvia. Garcia-Solorzano testified that he had asked his mother to send a letter in support of his application for withholding of removal, but his grandfather controlled the local post office and would not allow her to do so.

During questioning by DHS, Garcia-Solorzano could not remember whether he had been deported two or three times. DHS then presented evidence that he had been deported or removed in 1994, 1996, and 2008. According to the 1994 warrant of deportation, Garcia-Solorzano entered the United States near Laredo, Texas, in August 1989 and was deported in February 1994. Garcia-Solorzano reentered the United States in March 1994. A second warrant of deportation issued in December 1995, and Garcia-Solorzano was deported in January 1996 at the port of Laredo. DHS also presented evidence of his 2008 removal from the United States.

Garcia-Solorzano admitted that he had used the name Sergio Garcia Solorzano in the mid-1990s to seek adjustment of status and to obtain a Mexican passport. DHS presented evidence of a November 1995 sworn statement to Immigration and Naturalization Services, in which Garcia-Solorzano said that his true name was Sergio, that he had used the name Mario when he was ordered deported in 1994, and that Mario was the name of his brother who had died in 1990. When DHS asked how he obtained the birth certificate he used to procure the Mexican passport in the name of Sergio, Garcia-Solorzano said that he had been in Mexico for three days after his 1996 removal. During those three days, he returned to El Monteal by taxi (a twenty-five hour journey), attended a family party, where he found a fake birth certificate in Sergio's name and then returned to the border by car. He kept the fake birth certificate so that he could change his name and elude the Zetas and his family.

Garcia-Solorzano also testified that he had asked one of his uncles to send him a letter under the name Sergio so that he would have a piece of mail to confirm his address for his passport application.

Garcia-Solorzano could not explain why he did not mention his sister's death in his personal statement, nor could he remember the year she had been killed. He testified that he had told the asylum officer about the death during the interview, but that the interpreter translated slowly and the officer did not write it down. DHS also entered into evidence a 2008 sworn statement, in which Garcia-Solorzano wrote that he had previously used the name "Carlos Guerrero" and that he had been deported in February 1994 and December 1995. In the 2008 sworn statement, Garcia-Solorzano denied having any fear of persecution or torture if he were removed from the United States.

The IJ found Garcia-Solorzano not credible because "[h]is applications and testimony before this Court not only lacked convincing detail but contained several omissions and inconsistencies—some of which go to the heart of his claim—that cast considerable doubt on his credibility." The BIA found no error in the IJ's adverse credibility determination, concluding that it was based on "specific and cogent reasons, including inconsistencies and omissions within the applicant's testimony and when compared to the documentary evidence."

We review the BIA's decision under a substantial evidence standard, and "[w]e will reverse only if the petitioner demonstrates that the evidence is so compelling that no reasonable factfinder could fail to find in favor of the petitioner." Ezeagwu v. Mukasey, 537 F.3d 836, 839 (8th Cir. 2008) (quoting Bernal-Rendon v. Gonzales, 419 F.3d 877, 880 (8th Cir. 2005)). To qualify for withholding of removal under 8 U.S.C. § 1231(b)(3), an applicant must show that "his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality,

membership in a particular social group, or political opinion." Ezeagwu, 537 F.3d at 839 (quoting 8 C.F.R. § 1208.16(b)).

Garcia-Solorzano argues that the IJ's adverse credibility finding should be reversed as clearly erroneous. Administrative findings of fact, including findings on credibility, however, are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." Id. (quoting 8 U.S.C. § 1252(b)(4)(B)). Considering the totality of the circumstances and all relevant factors, an IJ may base a credibility determination on the consistency between an applicant's written and oral statements, the internal consistency of the applicant's statements, the consistency of the applicant's statements with other evidence of record, and any inaccuracies or falsehood in an applicant's statements, "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii); see id. § 1231(b)(3)(C) (instructing the trier of fact to assess the credibility of an applicant for withholding of removal "in the manner described in clauses (ii) and (iii) of section 1158(b)(1)(B)").

Substantial evidence supports the BIA's decision denying Garcia-Solorzano's application for withholding of removal, and Garcia-Solorzano has not shown that any reasonable adjudicator would be compelled to find his testimony credible. The discrepancies between the testimony he gave during his 2013 asylum interview, the personal statement that he submitted to the asylum officer, and his testimony before the IJ form a legitimate basis on which to base an adverse credibility finding. Garcia-Solorzano testified that he was repeatedly hit in the head with a pistol for refusing to train with the Zetas and that his sister was killed by the Zetas, but he did not mention the beatings or his sister's death during his asylum interview or in his personal statement. Moreover, despite repeated questions about any and all harm that he may have suffered in Mexico, Garcia-Solorzano failed to mention the incident he had alleged in his personal statement—that ten to fifteen men forced him to his knees, pressed a pistol to his head, and said that he had to work for the Zetas. Although

Garcia-Solorzano now contends that the testimony about being hit with a pistol and the statement about being threatened with a pistol were iterations of the same event, the IJ reasonably viewed the testimony and statement as recounting two different events. Moreover, the BIA reasonably rejected Garcia-Solorzano's assertion "that he did not previously mention his sister's murder because he was in the United States at that time, his mother called him to inform him of her death, and that he did not know the details surrounding her murder."[1] Garcia-Solorzano also offered varying statements regarding whether his mother's family, his father's family, or both families were associated with the Zetas. The IJ and the BIA reasonably rejected Garcia-Solorzano's claims that the discrepancies were not material or that they should be attributed to the fact that he had the flu, that the translator failed to fully translate his answers, or that the asylum officer failed to record his complete answers.

Garcia-Solorzano's inconsistent testimony regarding how much time he spent in Mexico following his 1996 deportation also supports the adverse credibility finding. Although he describes this testimony as an immaterial, "minute detail from 20 years ago," the change in his testimony from an immediate return to the United States to spending three days in Mexico allowed Garcia-Solorzano to explain how he was able to secure a Mexican birth certificate in the name of Sergio. The IJ permissibly described the account of his travel as "improbable," in light of the explanation that during those three days he made the twenty-five-hour trip home to El Monteal, happened to find a fake birth certificate at a family party, and then made the twenty-five-hour trip back to the border. Moreover, according to the time line Garcia-Solorzano set forth during his hearing before the IJ, he received the Mexican passport and used the name Sergio in 1995, yet he found the birth certificate in the name of Sergio that he then used to obtain the Mexican passport in 1996, causing the IJ to find that Garcia-Solorzano "simply could not have located the fake birth

_____

[1]Although Garcia-Solorzano now argues that he did not know about his sister's death until after the interview with the asylum officer, the record does not compel such a finding.

certificate in the manner that he claimed." The IJ further found that the explanation that "he chose to use this name in order to hide from his family and make them believe that he died is nonsensical." Finally, the IJ found that Garcia-Solorzano had been untruthful when discussing his identity, and the BIA rejected his argument that "he [had] misrepresented his identity to immigration officials because he feared being deported and discovered by his alleged persecutors in Mexico." Garcia-Solorzano has not shown that any reasonable adjudicator would be compelled to accept that argument.

Because substantial evidence supports the adverse credibility finding, and because Garcia-Solorzano has not submitted other evidence that corroborates the claim that his life or freedom would be threatened in Mexico because of his membership in a particular social group, we need not address his remaining arguments. See 8 U.S.C. § 1158(b)(1)(B)(ii) ("The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee."); Ali v. Holder, 776 F.3d 522, 526 (8th Cir. 2015) ("The combination of an adverse credibility finding and a lack of corroborating evidence for the claim of persecution means that the applicant's claim fails, 'regardless of the reason for the alleged persecution.'" (quoting Averianova v Mukasey, 509 F.3d 890, 895 (8th Cir. 2007))).

The petition for review is denied.

_____