United States Court of Appeals

For the Eighth Circuit

_____

No. 16-2554

_____

Kodjo Kegeh, also known as Jean-Paul Christian Kegeh

*Petitioner*

v.

Jefferson B. Sessions, III, Attorney General of the United States

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: March 7, 2017
Filed: July 31, 2017

_____

Before WOLLMAN, MELLOY, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Kodjo Kegeh applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). The Immigration Judge (IJ) denied all three applications. Kegeh appealed to the Board of Immigration Appeals (BIA), which affirmed the IJ's decision. Kegeh petitions for review, arguing that the IJ and the BIA erred in denying his applications. We deny the petition because Kegeh has failed to

meet his burden: to show that any reasonable adjudicator would be compelled to find in his favor.

I.

Since 1969, the West African nation of Togo has been governed by a single national political party. After the death of the previous president in 2005, Faure Gnassingbe became president by military fiat. In April of that year, a presidential election was held. Gnassingbe was elected president, but the election process was marred by irregularities and violence. Under pressure from the international community to change, President Gnassingbe and members of some opposition parties signed the Global Political Agreement (GPA) in 2006. One opposition party, the UFC, declined to join. Kodjo Kegeh was a member of the UFC.

Kegeh is a citizen and native of Togo, and his native language is French. He was admitted to the United States as a nonimmigrant visitor on March 1, 2011, with permission to remain here until August 31, 2011. He did not leave by that date and has remained in this country ever since. In late 2011, he submitted applications for asylum, withholding of removal, and protection under the CAT to the Department of Homeland Security's United States Citizenship and Immigration Services (USCIS).

Kegeh's application was accompanied by an affidavit. His attorney helped him prepare both documents. According to Kegeh, he prepared both documents in French, and then his French was translated into English. The English translation was then read back to him in French. Kegeh stated that he was aware of what was in his application and affidavit.

In February 2012, an asylum officer from USCIS interviewed Kegeh. Later that month, USCIS referred Kegeh to removal proceedings before an IJ after

concluding that Kegeh lacked credibility and provided testimony inconsistent with his affidavit. Removal proceedings then began pursuant to 8 U.S.C. § 1227(a)(1)(B).

## A.

At hearings before an IJ, Kegeh testified that he represented the UFC at a poll station during the April 2005 presidential election. After the voting closed and the ballots were being counted, military forces appeared and violence broke out. Kegeh testified that soldiers started beating people and using tear gas on them, but he did not mention soldiers shooting or using real bullets.

When the election results were announced two days later, and Gnassingbe was elected president, Kegeh and other members of the UFC protested. Kegeh testified that the military came to the protest armed with guns but did not use them against the protestors.

A short while later, Kegeh and others were kidnapped by the military. Soldiers took him into a military barracks where he was subjected to severe physical abuse. The next day, he and the others were driven out to a field. The beatings began again, and Kegeh fell unconscious. He testified that the next memory he had was waking up in a clinic with severe burns on his chest and torso. Kegeh avers that the military set him and the others on fire after the beatings. Villagers found him barely alive and took him to the clinic. In a 2012 letter purportedly from Kegeh's wife but written by a pastor in Togo, she confirms that Kegeh was beaten and burned in April 2005. At the hearing, Kegeh began to lift his shirt to reveal the extent of his burns. The IJ informed him that this was unnecessary as she already had pictures of the burns. She also gave him the chance to describe his injuries for the record.

Following the 2005 events, Kegeh left Togo for two years, but then returned. In 2010, new elections were held in Togo. Kegeh testified that he did not engage in

any political campaigning before the 2010 elections. He testified that he was involved in "pre-campaigning" to inform people of his party's program. He left Togo for the last time after an event preceding the 2010 elections. Kegeh testified that he was at a soccer game when a police officer approached him and several others with a "really juicy assignment." The officer handed him four bags and asked the group to take the bags to party headquarters in exchange for a large sum of money. Kegeh opened the bags and found guns, grenades, and other military articles. He assumed this was a plot by the military to frame him and other party members for possessing dangerous weapons. He threw the bags away and fled the country. Kegeh testified that soldiers came looking for him at his family's home in Togo in 2012 and physically assaulted his daughter.

B.

After two days of hearings, the IJ ruled against Kegeh on the ground that he lacked credibility. This credibility finding was rooted in numerous inconsistencies between Kegeh's testimony and the record, the implausibility of certain events, and a lack of corroborating evidence. The IJ found that the inconsistencies in Kegeh's story went directly to the underlying basis for his asylum claim.

For example, Kegeh had testified that no shooting occurred at the poll station the day of the 2005 presidential election. But in his affidavit he claimed the military used real bullets that day. When confronted about this discrepancy, Kegeh did not remember saying in his affidavit that real bullets were used. The asylum application of Francisco Anthony, a fellow member of the UFC who was granted asylum by USCIS in 2010, also contradicted Kegeh's testimony.[1] Anthony, purportedly a friend and someone Kegeh speaks with every other week, claimed that he worked at the same poll station in 2005 as Kegeh. Anthony claimed that the military opened fire

---

[1]Kegeh offered Anthony's asylum statement to support his own asylum claim.

-4-

on the crowd, killing one UFC member. Kegeh testified that there were no shots fired on the crowd. Kegeh also testified that he did not see Anthony at the poll station and has never discussed the events of that day with Anthony during their biweekly phone calls.

Kegeh also testified that the military did not use guns at the protests of the election results two days later. But in his affidavit he claimed that the military used real bullets that day. When the IJ tried to clarify this discrepancy, Kegeh's responses were vague and evasive.

Turning to the events of 2010, Kegeh testified that he did not take part in any political campaigning. His affidavit, however, states that he actively participated in door-to-door campaigning and whatever else was asked of him for the campaign. Also in his affidavit, Kegeh claimed that the ruling party was actively manipulating the electoral committee. When asked at the hearing if the electoral committee was being manipulated, Kegeh claimed he did not know what the electoral committee was. Further questions about what Kegeh had meant by "electoral committee" led to confusing and vague answers. Next, Kegeh testified that he was at a soccer game when the police officer had approached him with the bags of guns. But his affidavit stated that he was on the campaign trail, not at a soccer game. Kegeh explained that it was actually a campaign soccer tournament.

The IJ also found Kegeh's testimony regarding his relationship with Anthony to be implausible. For one thing, the IJ found that, if Anthony's asylum statement was true, then it was implausible for Kegeh not to have heard gunshots or learned of the death of a fellow UFC member after the 2005 election. The IJ expressed doubt that Kegeh had never discussed these events with Anthony. The court lastly noted inconsistencies with Kegeh's claim that he never spoke with Anthony about the burns he received at the hands of the military. Later testimony revealed a brief exchange where Kegeh and Anthony did discuss the burns between themselves.

The IJ noted other inconsistencies in Kegeh's testimony. Kegeh, who claimed that he had been to the UFC's headquarters many times, could not give the street name of the headquarters. Kegeh also testified that the GPA was signed in 2007; it was signed in 2006. There was also a discrepancy as to when soldiers physically assaulted his daughter: Kegeh testified that the attack occurred in 2012 while his wife stated that it happened in 2010.

The IJ also made an adverse demeanor finding. She noted that Kegeh became fidgety anytime his relationship with Anthony was discussed and anytime he was asked about his asylum interview and affidavit. Kegeh grew visibly agitated whenever confronted with an apparent discrepancy.

Finally, the IJ found that Kegeh had not provided corroborating evidence of his claims. Kegeh failed to provide the original French affidavits or offer an adequate explanation as to why the originals were not available. This led the IJ to give little weight to Kegeh's justifications for errors or inconsistencies.

II.

Kegeh appealed the IJ's order to the BIA, who affirmed the IJ's conclusions. "Both immigration decisions will be reviewed together whenever the BIA adopts and affirms the IJ's decision, but also adds reasoning of its own." Arevalo-Cortez v. Lynch, 829 F.3d 1022, 1026 (8th Cir. 2016). "We review questions of law de novo, and we will reverse findings of fact only if the evidence is so compelling that no reasonable fact finder could fail to find in favor of the petitioner." Ali v. Holder, 776 F.3d 522, 526 (8th Cir. 2015) (internal quotation marks omitted). If the decisions of the IJ and BIA are supported by substantial evidence in the record, we will affirm. Id.

"Under our immigration law, [t]he Attorney General has discretion to grant asylum to a refugee, defined as an alien who is unable or unwilling to return to [his] home country because of past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Fesehaye v. Holder, 607 F.3d 523, 526 (8th Cir. 2010) (first alteration in original) (internal quotation marks omitted). As amended by the REAL ID Act of 2005, federal law places the burden on the petitioner to provide credible, persuasive, and sufficiently specific evidence in support of his petition. See 8 U.S.C. § 1158(b)(1)(B)(i)-(ii).

"All applications for asylum and withholding of removal require a threshold determination of the applicant's credibility." Garcia v. Lynch, 655 F. App'x 511, 514 (8th Cir. 2016) (per curiam) (citing 8 U.S.C. § 1158(b)(1)(B)(iii)). "The IJ is in the best position to make credibility findings because [she] sees the witness as the testimony is given." Fesehaye, 607 F.3d at 527 (alteration in original) (internal quotation marks omitted). As a result, we must defer to the IJ's credibility determinations when the IJ provides specific, cogent reasons for her disbelief. See Onsongo v. Gonzalez, 457 F.3d 849, 852 (8th Cir. 2006); see also Yu An Li v. Holder, 745 F.3d 336, 340 (8th Cir. 2014) ("Such findings are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." (internal quotation marks omitted)). "The combination of an adverse credibility finding and a lack of corroborating evidence for the claim of persecution means that the applicant's claim fails, regardless of the reason for the alleged persecution." Averianova v. Mukasey, 509 F.3d 890, 895 (8th Cir. 2007) (internal quotation marks omitted).

Kegeh argues that the IJ erred in its credibility findings either because (1) he explained the inconsistencies, (2) the inconsistencies did not go to the heart of his right to asylum, or (3) they did not enhance his claim for asylum.

First, Kegeh claims he has offered sufficient explanations for some of his inconsistent testimony. Kegeh points out that he explained the inconsistency about when the GPA was signed in his hearing. His attorney asked him on the second day of the hearing when the GPA was signed, and Kegeh responded that it was signed in 2006 but that he did not hear about it until 2007, thus explaining the inconsistency. Kegeh has also offered medical records purportedly showing that his daughter was attacked in 2012 as he testified to at his hearing.

Second, Kegeh argues that several inconsistencies in his testimony do not go to the heart of his asylum petition. These inconsistencies include the name of the street where party headquarters was located, any campaigning Kegeh might have done prior to the 2010 election, and the use of different terms for the campaign soccer tournament. Kegeh contends that "[a]n adverse credibility finding must be based on issues that go to the heart of the applicant's claim [and] cannot be based on an irrelevant inconsistency." Marikasi v. Lynch, 840 F.3d 281, 287 (6th Cir. 2016) (internal quotation marks omitted). These inconsistencies, Kegeh continues, cannot form the basis of an adverse credibility finding against him.

Finally, Kegeh alleges that the remaining inconsistencies in his testimony failed to enhance his claim for asylum, and therefore were immaterial. These inconsistencies included whether the military used real bullets against UFC members, his confusion about what the electoral committee was, his lack of knowledge about the murder of a UFC member, and inconsistencies with statements made by Anthony in his asylum application. Kegeh argues that "if discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." See Ceraj v. Mukasey, 511 F.3d 583, 591 (6th Cir. 2007) (internal quotation marks omitted).

Kegeh's arguments fall short of the standard set forth under current federal immigration law. First, "even where an applicant's explanations are plausible, an

agency is not required to accept the explanations if an alternative explanation is reasonable." Nadeem v. Holder, 599 F.3d 869, 873 (8th Cir. 2010) (citing Rafiyev v. Mukasey, 536 F.3d 853, 857 (8th Cir. 2008)). Second, immigration law now permits an IJ to base her credibility determination on the consistency of a petitioner's testimony and other written statements in the record, "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." Yu An Li, 745 F.3d at 341 (internal quotation marks omitted); see also Slyusar v. Holder, 740 F.3d 1068, 1072 (6th Cir. 2014) (acknowledging that the REAL ID Act reversed prior law that required an inconsistency reach the heart of the matter when making a credibility determination). "[E]ven ancillary inconsistencies in a petitioner's testimony support adverse credibility findings." Slyusar, 740 F.3d at 1073. And the "cumulative effect" of multiple inconsistencies, even if not directly material to the petition, can support a reasonable fact finder's adverse credibility determination. See Xiu Xia Lin v. Mukasey, 534 F.3d 162, 167 (2d Cir. 2008). Third, several of the inconsistencies in his testimony do, in fact, go to the heart of his petition. Kegeh claims that he has suffered persecution in the past and has a well-founded fear of future persecution because of his political activities. Yet his testimony revealed significant inconsistencies as to his political activities. For example, a member of his political party was murdered the day of the 2005 presidential election, but Kegeh was not aware of this and apparently has never discussed the events of that day with others who were aware. Kegeh also contradicted himself as to whether the soldiers used real bullets. In his affidavit he spoke of an electoral committee in Togo, but at the hearing expressed confusion regarding what the electoral committee was. Even the minor inconsistencies or lack of knowledge exhibited by Kegeh, such as failing to know the party headquarters's street address or what kind of campaigning he did before the 2010 election, provide a fact finder reasonable doubt concerning the credibility of his claim of persecution for political activities. See Turay v. Ashcroft, 405 F.3d 663, 668 (8th Cir. 2005) ("[I]t is essential that the victim's political opinion motivates the persecution.").

"We conclude the IJ's credibility finding was supported by specific, cogent reasons for disbelief, and we cannot say 'any reasonable adjudicator would be compelled to conclude to the contrary.'" Thu v. Holder, 596 F.3d 994, 999 (8th Cir. 2010) (quoting 8 U.S.C. § 1252(b)(4)(B)). Kegeh's remaining arguments center on his extensive burns,[2] which he contends constitute proof of torture. The IJ, however, did not find Kegeh's testimony credible, as discussed above. Further, Kegeh testified that he was unconscious and then woke up with burns on his body. He could only surmise as to how he got the burns. Neither he nor the burns, therefore, could provide evidence for a torture claim. The only corroborating evidence Kegeh offered for his torture claim was a letter from his wife. But the IJ gave little weight to that letter, because it was written in French and Kegeh's wife does not speak French. For this specific, cogent reason, we cannot say the IJ erred in affording little weight to the letter. See Fesehaye, 607 F.3d at 527-28. In the end, "substantial evidence supports the denial of asylum." Arevalo-Cortez, 829 F.3d at 1027.

III.

"When asylum, withholding removal, and CAT claims are based on the same discredited testimony, the adverse credibility finding is fatal to all three claims." Ali, 776 F.3d at 528 (internal quotation marks omitted). Accordingly, we deny Kegeh's petition for review.

_____

[2]Kegeh complains the IJ prevented him from removing his shirt to reveal his burns during the hearing. But, as stated previously, the IJ had pictures of the burns taken by a physician. What she asked Kegeh to do was to describe his burns for the official record, which lifting his shirt would have failed to accomplish. Because the IJ considered all of the admitted evidence—including Kegeh's medical reports and photos— in making her decision, we see no error.